## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

KARLA J.,

      Plaintiff,

v.                                  CIVIL ACTION NO. 3:22-cv-00125

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

      Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Karla J. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. (ECF No. 2.) By standing order entered on January 4, 2016, and filed in this case on March 11, 2022, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Plaintiff's Brief in Support of Complaint (ECF No. 9), Commissioner's Brief in Support of Defendant's Decision (ECF No. 12) and Plaintiff's Reply Brief (ECF No 13). Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 9), **GRANT** the Commissioner's request to affirm her decision (ECF No. 12), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

# I.    BACKGROUND

## A. Information about Claimant and Procedural History of Claim

Claimant was 50 years old on her alleged disability onset date and 52 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. 206.)[1] Claimant has a general-equivalency degree, and her work history includes jobs as a medical-office worker, food-service worker, and sleep-lab technician. (Tr. 97, 267.) Claimant alleges she became disabled on January 17, 2019, due to COPD, hyperthyroidism, chronic cough, endometriosis, coccydynia, osteoarthritis in the knees, lumbar pain with bilateral sciatica, failed right shoulder, anxiety, depression, and PTSD. (Tr. 121, 206.)

Claimant protectively filed her application for DIB on January 23, 2019. (Tr. 206-212.) Her claim was initially denied on August 6, 2019, and again upon reconsideration on January 7, 2020. (Tr. 81-113.) Thereafter, on February 20, 2020, Claimant filed a written request for hearing. (Tr. 140.) An administrative hearing was held before an ALJ by videoconference on May 20, 2021. (Tr. 47.) On July 22, 2021, the ALJ rendered an unfavorable decision. (Tr. 22.) Claimant then sought review of the ALJ's decision by the Appeals Council that same day. (Tr. 1.) The Appeals Council denied Claimant's request for review on January 10, 2022, and the ALJ's decision became the final decision of the Commissioner on that date. (Tr. 1–7.)

Claimant timely brought the present action on March 8, 2022, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed a timely Answer (ECF No. 7) and a transcript of the administrative proceedings (ECF No. 8). Claimant subsequently filed her Brief in Support of Complaint (ECF No. 9), and in response, the Commissioner filed her Brief in Support of Defendant's

---

[1] All references to "(Tr.)" refer to the Transcript of Proceedings filed in this action at ECF No. 8.

Decision (ECF No. 12). Plaintiff then filed a timely Reply Brief. (ECF No. 13). As such, this matter is fully briefed and ripe for resolution.

### B. Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it in relevant part here for the convenience of the United States District Judge. The vast majority of Claimant's medical records significantly predate Claimant's alleged onset date of January 17, 2019, by several years.

On December 15, 2009, Claimant presented to her primary care physician, Breton L. Morgan, M.D. (Tr. 646.) She reported "having, for the last several years, chronic back pain, an achy low back, stiff and achy, especially when sitting down and first moving around." (Tr. 646.)

On July 3, 2013, Claimant presented to Dr. Morgan for follow up on her lumbar spine disorder. (Tr. 610.) It was noted that Claimant had "long standing bilateral sacroiliitis and coccydynia," and that Dr. Morgan was trying to help Claimant lose weight "to help these orthopedic issues." (Tr. 610.) Claimant had been on Zanaflex, but it was noted that she did not tolerate it. (Tr. 610.) Claimant followed up with Dr. Morgan on August 30, 2013, where it was noted that Claimant was doing "better" following a switch to Diclofenac for chronic anti-inflammatory therapy. (Tr. 608.)

A gallbladder ultrasound from February 25, 2014 was unremarkable, and Claimant's gallbladder was found to be unremarkable in shape and size, with no evidence of cholecystitis, cholelithiasis, or biliary dilation. (Tr. 680.)

On March 31, 2014, an MRI of Claimant's right shoulder was obtained. (Tr. 678.) The radiologist found acromioclavicular joint arthropathy, as well as abnormal signal

intensity in the supraspinatus tendon, suggesting a partial-thickness tear or tendinopathy. (Tr. 678.) Claimant was told to follow up. (Tr. 678.)

On June 20, 2014, Claimant presented to Dr. Morgan for follow-up on her complaint of right shoulder impingement. (Tr. 598.) An MRI was not remarkable; vertebral bodies and disc spaces were intact, with minimal degenerative disc disease changes identified at C5-6 and C6-7, and T2-3 level. (Tr. 598, 704.) No significant evidence of spinal or foraminal stenosis was seen, and no additional significant disc bulging, disc herniation, abnormal signal intensity in the spinal cord, or other significant findings were suggested. (Tr. 704.) Claimant was seen by a specialist who did not recommend any particular treatment of this issue, even though the MRI did show arthritis and supraspinatus tendonopathy. (Tr. 598.) An EMG of the right upper extremity was normal. (Tr. 598.) Claimant was given an injection, but reported that she did not feel that the injection was effective for her. (Tr. 600.)

On December 9, 2014, Claimant presented to Dr. Morgan to follow up after surgery on a large mass on the right side of her neck which was revealed to be salivary gland tissue. (Tr. 590, 698.) Dr. Morgan noted that the mass was negative for malignancy, with the incision area healing nicely. (Tr. 590.)

On January 22, 2015, a transvaginal pelvic ultrasound showed unevenness of the sonographic texture of the uterus but was otherwise unremarkable, with no evidence of uterine mass lesions. (Tr. 326.)

Claimant presented to Dr. Morgan again on June 30, 2015. (Tr. 582.) She reported having a lot of gastrointestinal distress as well as continued trouble with coccydynia and increasing trouble with right shoulder pain, carpal tunnel in her right hand, and dropping

things with the right hand. (Tr. 582.) Dr. Morgan noted a normal EMG and also noted that "[t]he grips are okay." (Tr. 582.)

The following year on August 10, 2016, Claimant was again seen by Dr. Morgan. (Tr. 485.) Claimant complained of her extreme coccydynia and was noted to be very frustrated. (Tr. 485.) She stated that she did not want to be referred to orthopedics, so she was continued on Valium and Norco. (Tr. 485.) Dr. Morgan also noted that Claimant had tried injection therapy for her coccydynia but "has failed," and that she failed on Neurontin and Lyrica as well due to side effects. (Tr. 486, 580.)

On August 18, 2016, a CT of the abdomen and pelvis showed that the cecum is rather low in position with the tip of the cecum in the mid-right lower pelvis. (Tr. 332.) The sacrum and coccyx appeared intact. (Tr. 332.) A portion of the bladder wall showed increased thickness with suggestion of a precancerous 1-cm sized polypoid lesion. (Tr. 333, 775.)

On October 13, 2016, an MRI of the abdomen and pelvis was inconclusive for evaluating Claimant's bladder lesions and further evaluation with cystoscopy was recommended. (Tr. 338.) The bony pelvis was found to be within normal limits. (Tr. 340.)

On November 11, 2016, Claimant followed up with Dr. Morgan. (Tr. 482.) She complained of lower back and pelvic pain, but it was noted that her head and neck examination was unremarkable. (Tr. 482.) She was prescribed narcotic pain medication and scheduled to follow up in a month. (Tr. 482.)

On December 13, 2016, Claimant underwent endometrial ablation. (Tr. 534.) On December 20, 2016, Claimant was seen for chronic pelvic pain, and had a diagnostic laparoscopy with lysis of adhesions and pelvic biopsies. (Tr. 361, 839.) Endometrial adhesions were diagnosed. (Tr. 362.) The abdominal examination was benign and there

was no pelvic pathology identified on a CT scan of the abdomen and pelvis. (Tr. 362.) Claimant was instructed to continue on her home progestin regimen for suppression of potential residual underlying endometriosis; further, the option of a hysterectomy for chronic pain symptoms not able to be adequately managed medically was discussed. (Tr. 362.)

The following January 18, 2017, Claimant was hospitalized for bilateral pneumonia and a pulmonary embolism; she was found to have a possible autoimmune disorder given multiple elevated autoimmune markers. (Tr. 366.) A CT of the abdomen showed multilevel degenerative disc disease. (Tr. 394.) On March 3, 2017, a CT angiogram of the chest showed no acute process in the upper abdomen. (Tr. 569.) The pulmonary arteries were enhanced normally and there was no evidence of pulmonary embolism. (Tr. 569.)

Claimant presented to Dr. Morgan on June 7, 2017. (Tr. 474.) She continued to complain of chronic pain in her low back and tailbone regions, and Dr. Morgan continued her prescription for pain medication. (Tr. 474.) She also complained of anxiety and insomnia, and was continued on her prescription for Valium. (Tr. 474.)

On February 2, 2021, Claimant presented at Hopewell Health Centers for a mental health assessment on referral from her treating physician for her major depressive disorder and generalized anxiety disorder. (Tr. 462.) The recommended treatment plan was referral for individual counseling, with a referral to psychiatry as well. (Tr. 465.)

On February 18, 2021, Claimant presented at Hopewell Health Centers for a cognitive behavioral therapy session. (Tr. 467.) She was ordered to return in two weeks. (Tr. 467.) On February 24, 2021, Claimant returned to her primary care physician and reported that she was not happy with the counselor she was seeing, and that she was "switching" and going to find someone else. (Tr. 471.) Claimant further reported that she

had been experiencing severe pain in her low back and tailbone area since around Christmas; she requested a prescription for a muscle relaxer. (Tr. 472.)

On March 19, 2021, Claimant presented at Hopewell Health Centers for a cognitive behavioral therapy session, and was ordered to follow up in two weeks. (Tr. 794-95.)

### C. Consultants

Kara Gettman-Hughes, MA, performed a Mental Status Examination on May 28, 2019. (Tr. 409.) MA Hughes noted Claimant's straight posture and slow gait, as well as the fact that Claimant drove herself about 30 miles to the examination. (Tr. 409.) Claimant denied ever receiving mental health treatment other than being prescribed medications by her family physician. (Tr. 410.) Claimant was observed to have proper hygiene, showed fair eye contact, was cooperative, and overall oriented to all spheres. (Tr. 411.) She denied suicidal and homicidal ideation, there was no evidence of unusual psychomotor behaviors, immediate memory was normal, and concentration was normal. (Tr. 412.) However, her observed mood was sad, her affect was labile, her thought processes were circumstantial, her thought content was remarkable for obsessive thoughts, her judgment was mildly impaired, her insight was poor regarding social awareness, and she showed a partially impaired memory. (Tr. 412.) Her persistence was moderately deficient based on her ability to remain focused on a task, and her pace was variable. (Tr. 412.) MA Hughes diagnosed Claimant with major depressive disorder, recurrent, moderate, "[p]er the claimant's report" of consistent feelings of sadness, guilt, and failure, as well as the claimant's report of a loss of interest in activities, fatigue, and other reported symptoms. (Tr. 412.) MA Hughes also diagnosed Claimant with generalized anxiety disorder "based on the claimant's report of excessive anxiety and

worry" and other reported symptoms, as well as somatic pain disorder based upon Claimant's reports of pain. (Tr. 413.)

In June 2019, state agency psychologist Paula J. Bickham, M.D., reviewed the record, including the report of Dr. Gettman-Hughes, and opined that Claimant had mild mental limitations. (Tr. 89-90.)

Stephen Nutter M.D. performed an internal medicine examination on July 22, 2019. (Tr. 416.) Dr. Nutter observed that Claimant ambulated with a normal gait, appeared stable at station, and comfortable in the supine and sitting positions. (Tr. 418.) Claimant demonstrated diffuse abdomen tenderness everywhere except for the mid-epigastric area; there was no evidence of organomegaly or masses, and no rebound tenderness, guarding, or rigidity. (Tr. 418.) There was pain and tenderness in the right shoulder and mild tenderness at the left elbow. (Tr. 418.) Examination of the hands revealed no tenderness, redness, warmth or swelling, and no atrophy. While there was diminished grip strength when using the dynamometer, Claimant was able to squeeze Dr. Nutter's fingers well during the physical examination, with a good grip; therefore, he rated grip strength as being intact at 5/5 bilaterally. (Tr. 418.) Claimant's right knee range of motion was limited due to complaints of back pain, examination of the cervical spine revealed pain and tenderness to the paraspinal muscles and the spinous processes in the cervical spine, and examination of the dorsolumbar spine revealed mild tenderness to percussion in the L4 to L5 area with more significant tenderness noted along the sacrum. (Tr. 419.) The last third of the sacrum and coccyx were unable to be palpated due to tenderness. (Tr. 419.) Straight leg test in the sitting and supine position was normal. (Tr. 419.) There was no hip joint tenderness, redness, warmth, swelling or crepitus, but there was pain with range of motion testing in both hips. (Tr. 419.) Muscle strength was normal

at 5/5 bilaterally in the upper and lower extremities with no evidence of atrophy noted. (Tr. 419.) Claimant was only able to complete about 80% of a squat and had to stop due to back and knee pain. (Tr. 419.) Dr. Nutter's impression was chronic cervical and lumbar strain, abdominal pain and history of endometriosis, arthralgia, and restrictive pulmonary disease with reported history of COPD. (Tr. 419.)

In August 2019, state agency physician Dominic Gaziano, M.D., reviewed the record and found that Claimant could perform a range of medium work, could stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and lift and/or carry up to 50 pounds occasionally and 25 pounds frequently. (Tr. 92-94.) Dr. Gaziano further found that Claimant could frequently engage in postural activities, had no manipulative, visual, or communicative limitations, and that her only environmental limitation was that she should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and extreme cold. (Tr. 93-94.)

In October 2019, Hedy Moundbatten-Windsor, M.D., reviewed the record and also found that Claimant could perform a range of medium work. (Tr. 107-109.) Dr. Mountbatten-Windsor agreed with Dr. Gaziano's specific findings, except she also found that Claimant should be limited to occasionally climbing ladders/ropes/scaffolds, rather than frequently being able to do so. (Tr. 107-109.)

William Steinhoff, M.A. performed a mental status examination on December 2, 2019. (Tr. 438.) MA Steinhoff observed that Claimant's grooming was fair, and that Claimant was cooperative but reserved in her interaction, mildly restless, and somewhat hesitant. (Tr. 438.) She was noted to have arrived on time, and drove herself. (Tr. 438.) Claimant reported that she had no history of mental health treatment; she stated she could not afford treatment because she has no insurance and was told she could not have

Medicaid because her assets were too high. (Tr. 439.) She was observed to be restless, fidgety, and hesitant in her interaction, with a depressed mood and labile, tearful affect. (Tr. 441.) Impairment in recent memory, attention, and concentration was noted. (Tr. 441.) MA Steinhoff assessed Claimant with major depressive disorder and generalized anxiety disorder, and gave a "guarded" prognosis. (Tr. 441.)

On January 4, 2020, state agency psychologist Debra Lilly, Ph.D., found after reviewing the record that Claimant had moderate mental health limitations in several areas, and as a result could only perform tasks with three or fewer steps, in settings in which she did not have high production quotas. (Tr. 105-111.) Additionally, Dr. Lilly found that Claimant required a work-like setting that did not require frequent interactions with the general public. (Tr. 105-111.)

### D. Hearing Testimony

Claimant, who was represented by counsel, testified at the hearing that her ability to work was limited by pain in her back and tailbone, prohibiting her from sitting or standing longer than five to ten minutes. (Tr. 53.) She also testified having "endometriosis adhesions" that caused cramping and pain; right-shoulder problems that interfered with her ability to "grab anything" without pain; COPD that caused protracted coughing; "grinding" in her knees; trouble bending her knees; anxiety; and depression. (Tr. 53-55.) With respect to her mental impairments, Claimant testified that her son was killed tragically in an accident, and she was unable to "get past it." (Tr. 55.) Claimant testified that she would obsess over her son's death, was depressed about her health problems and inability to work, and was unable to concentrate. (Tr. 61-62.) She also testified that her anxiety caused daily panic attacks, triggered by her inability to breathe. (Tr. 64.) She described herself as socially withdrawn, with memory difficulties. (Tr. 64-65, 67.)

Claimant estimated that if she were placed back to work, she would miss four days out of the week on a regular basis. (Tr. 67.)

With respect to Claimant's physical impairments, she testified that her tailbone pain prevented her from sitting up straight. (Tr. 54.) She previously was able to work despite the pain because she was taking four pain pills per day, but that now she "had to cut back on all that stuff" and only "take[s] Tylenol now." (Tr. 56.) Claimant testified that her COPD prevents her from walking more than a single block without needing to sit down, and coughing uncontrollably. (Tr. 57.) She has to lay down most of the day in a typical day, and cannot pick up something heavier than a gallon of milk without pulling her shoulder. (Tr. 58.) She experiences problems with gripping and handling on her right hand, and she drops things every day. (Tr. 58-59.) She testified that her husband and son do most household chores, but that she can fold towels. (Tr. 59.) She cannot bend over without pain, and cannot operate a vacuum cleaner without triggering her back pain. (Tr. 59-60.) She further testified that she is not able to bend, twist, kneel, crouch, or squat. (Tr. 60.)

Next, VE Anthony Michael testified. (Tr. 69.) The ALJ asked him to identify the exertional skill level of Claimant's past work. The VE testified that Claimant's past work as a sleep lab technician is classified as semi-skilled, at a medium level of exertion as generally performed, and a light level of exertion as actually performed. (Tr. 70.) The VE further testified that Claimant's past work as a receptionist at a doctor's office is semi-skilled and sedentary; Claimant's past work as a hotel desk clerk is classified as semi-skilled and light; and Claimant's past work as a food service worker at a nursing home is classified as unskilled, at a medium level of exertion as generally performed, and a heavy level of exertion as actually performed. (Tr. 70.)

The ALJ asked the VE to assume a hypothetical individual of the claimant's age, education, and work experience who is able to perform medium work, can occasionally climb ladders, ropes, and scaffolds, frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, must avoid concentrated exposure to extreme cold and irritants such as fumes, dust odors, gases, and poorly ventilated areas, and the individual can frequently reach in all directions, including overhead with the right upper extremity. (Tr. 70.) The VE testified that an individual with those limitations would be able to perform all of Claimant's past work, both as generally and actually performed—except for the food-service-worker position at the hospital, where the individual would only be able to perform medium work as generally performed. (Tr. 71.) Further, the VE testified that there are also unskilled jobs at the medium exertion level that the hypothetical individual could perform, such as night cleaner, laundry worker, and hand packager. (Tr. 71.) In response to questions from Claimant's counsel, the VE also testified that if the hypothetical individual were unable to kneel, stoop, crouch, and balance, he or she would be unable to work any of the jobs the VE previously listed. (Tr. 72.) Additionally, the VE responded to questioning from Claimant's counsel that if the hypothetical individual would be absent from work four or more days per month, that would preclude all full-time competitive employment. (Tr. 72.) The VE also testified that if the hypothetical individual's mental-health impairments limited him or her—making him or her unable to interact with supervisors, co-workers, or the general public—such a limitation would preclude the hypothetical individual from competitive employment. (Tr. 72-73.) Finally, the VE testified that if an individual worker would be unable to complete even simple instructions, he or she would be precluded from the ability to perform any full-time competitive employment. (Tr. 73.)

### E. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is engaged in substantial gainful activity, then the analysis stops. On the other hand, if the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically-determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the

durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's [RFC]" before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with

the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of his or her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If the claimant does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether he or she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find him or her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant cannot perform other work, the ALJ will find him or her "disabled." *Id.*

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20

C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant had not engaged in substantial gainful activity since January 17, 2019, the alleged onset date. (Tr. 25.) The ALJ found that Claimant's arthropathy of the right acromioclavicular joint, degenerative disc disease with sciatica, and COPD constituted "severe" impairments. (Tr. 25.) However, the ALJ found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 28.)

Assessing Claimant's RFC, the ALJ explained that Claimant's treatment during the relevant time period was chiefly conservative, relying on the prescription of medication from her primary-care physician. (Tr. 30-31.) Additionally, the ALJ pointed to Dr. Nutter's finding from the consultative physical examination that Claimant displayed normal gait, clear lung fields, normal muscle strength in the upper and lower extremities, normal grip strength in both hands, and normal straight leg testing. (Tr. 32, 419-420.) The ALJ also explained that while Claimant's pulmonary function study did reveal restrictive disease, it was very mild. (Tr. 32, 421.) Based on the evidence, the ALJ determined that Claimant has the residual functional capacity to perform medium work, but with the following limitations: the claimant can frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently balance, stoop, kneel, crouch,

and crawl; should avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, and poor ventilation; and can frequently reach in all directions (including overhead) with the right upper extremity. (Tr. 29.) In assessing this RFC for Claimant, the ALJ emphasized the findings of state agency physicians Dr. Gaziano and Dr. Mountbatten-Windsor that Claimant could perform a reduced range of medium work as persuasive. (Tr. 31.) However, the ALJ's RFC imposed the additional limitation that restricted Claimant to frequent—rather than constant—reaching in all directions with her right upper extremity, to account for her right shoulder complaints.

Based upon this RFC, the ALJ found that Claimant is capable of performing past relevant work as a sleep lab technician, receptionist, EKG technician, hotel desk clerk, and food service worker, as "[t]his work does not require the performance of work-related activities precluded by" Claimant's RFC. (Tr. 32.) The ALJ also enlisted a vocational expert ("VE") to aid in finding, in the alternative, that Claimant is capable of working at the medium level as a night cleaner or laundry worker. (Tr. 33.) Relying upon the VE's testimony, the ALJ found that Claimant was capable of making a successful adjustment to other work that exists in significant numbers in the national economy, and therefore that Claimant was not disabled under the Social Security Act. (Tr. 34.)

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it

must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.*  "[T]he threshold for such evidentiary sufficiency is not high."  *Id.*  "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence.  *Id.* (quoting *Craig*, 76 F.3d at 589).

### III.    ANALYSIS

#### A.  Medical Opinion Evidence

Claimant first argues that the ALJ erred in evaluating the medical opinion evidence. Specifically, Claimant asserts that the ALJ erred because he did not discuss "the persuasiveness" of the medical opinions "from the Agency's own psychologists and doctor," Kara Gettman-Hughes, M.A., Will Steinhoff, M.A., and Stephen Nutter, M.D. (ECF No. 9 at 6-8.) Citing 20 C.F.R. § 404.1520c(b)(2), Claimant argues that the ALJ was required to explain in the decision how he considered the supportability and consistency factors for each of these three medical sources' consultative examination reports. *Id.* In response, the Commissioner argues that a medical opinion is defined as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform the physical, mental, or other demands of work activity or adapt to environmental conditions. (ECF No. 12 at 10 (citing 20 C.F.R. § 404.1513(a)(2)).) Because the consultative examiners at issue only provided diagnoses and did not place any work

restrictions on the Claimant, the Commissioner reasons that the consultative examiners' work product does not constitute a medical opinion that would require an explanation of the ALJ's consideration of the supportability and consistency factors. (ECF No. 12 at 10 ("Dr. Nutter did not issue a medical opinion here").)

It is well-established that an ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record," including medical evidence of record. 42 U.S.C. § 423(d)(5)(B). The ALJ's consideration must be demonstrated by "a discussion of the evidence" and the "reasons upon which [the decision] is based." 42 U.S.C. § 405(b)(1). Certain types of evidence, such as medical opinion evidence, impose specific written requirements upon the ALJ. For instance, in evaluating medical opinions for claims filed after March 27, 2017, an ALJ must evaluate a medical opinion's persuasiveness using the following criteria: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and the examining relationship; (4) specialization; and (5) other factors. 20 C.F.R. § 416.920c(c). The Social Security Administration considers supportability and consistency to be the most important factors when evaluating the persuasiveness of medical opinions and prior administrative medical findings in the claimant's case record. *Id*. § 416.920c(a). Therefore, when assessing a medical opinion's persuasiveness under this framework, the ALJ's decision *must* explain "how [he or she] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [a claimant's] determination or decision." *Id*. § 404.1520c(b)(2). An ALJ's failure to adequately explain the supportability or consistency

factors in making his or her evaluation of the persuasiveness of opinion evidence is grounds for remand. *Ayala*, 2022 WL 3211463, at *5.

Not all medical evidence falls within the scope of medical opinion, however. The regulations carefully define a medical opinion as follows:

> A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: . . .
>
> (i)    Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (ii)   Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
> (iii)  Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>
> (iv)   Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 404.1513(a)(2).

A consultative examination report can constitute a medical opinion within the scope of 20 C.F.R. § 404.1520c(b)(2), requiring the ALJ's express consideration of its supportability and consistency. In *Ayala*, for example, the record included the report of Dr. Michael Healy, who conducted a consultative internal medicine examination of Mr. Ayala. *Ayala*, 2022 WL 3211463, at *8-9. Dr. Healy's report made findings as to Ayala's gait, stance, stride, and range of motion; based on his findings, Dr. Healy opined that Ayala had moderate limitations sitting, standing, walking, climbing stairs, bending, and lifting. *Id.* at *9. The *Ayala* Court therefore agreed with the claimant that the ALJ was

required "to properly explain the supportability and consistency factors" as to Dr. Healy's opinion, and the ALJ's failure to do so constituted grounds for remand. *Id.* at *16. Simply because a consultative examination report can offer a medical opinion, however, does not mean all such reports do so—as the regulations make clear. *See* 20 C.F.R. § 416.919n(c)(6) ("Although [the Social Security Administration] will ordinarily request a medical opinion as part of the consultative examination process, the absence of a medical opinion in a consultative examination report will not make the report incomplete."); 20 C.F.R. § 404.1519n(c)(6) (same).

Here, just as in *Ayala*, the ALJ did not explain the supportability and consistency factors in his assessment of the consultative examination reports of agency psychologists Kara Gettman-Hughes, M.A., and Weill Steinhoff, M.A., as well as that of agency physician Stephen Nutter, M.D. (Tr. 409, 438.). As the Commissioner points out, however, their reports do not provide opinions regarding Claimant's limitations or restrictions in the ability to perform work activity within the scope of 20 C.F.R. § 404.1513(a)(2). For instance, while Dr. Nutter—just like Dr. Healy in the *Ayala* case— examined the Claimant and made findings as to her gait and range of motion, only the latter went on to opine that Ayala had moderate limitations sitting, standing, walking, climbing stairs, bending, and lifting. (Tr. 418-419.) Specifically, while Dr. Nutter diagnosed Claimant with chronic cervical and lumbar strain, abdominal pain and history of endometriosis, arthralgia, and restrictive pulmonary disease and reported history of COPD, he merely concluded that Claimant had "positive physical findings" related to her complaints. (Tr. 419.) Dr. Nutter offered no opinions or conclusions regarding Claimant's ability to perform the mental or physical demands of work activities, Claimant's ability to perform other demands of work, or Claimant's ability to adapt to environmental

conditions. Nor do the reports of Kara Gettman-Hughes, M.A., or Will Steinhoff, M.A. (Tr. 409-413, 438-441.) Accordingly, the undersigned finds no legal error.

## B. RFC Determination

Claimant next argues that remand is appropriate because certain medical examination findings, along with Claimant's subjective complaints, required the ALJ to impose additional RFC restrictions. (ECF No. 9 at 12-15.) Claimant highlights, for instance, her testimony that her anxiety induces diarrhea; based upon her testimony, Claimant concludes that in determining her RFC, the ALJ was required to evaluate the frequency at which Claimant needs to use the bathroom, and to analyze how that restriction impacted Claimant's ability to work. *See id.* at 13. Claimant further states that "[t]he ALJ made no mention of Ms. Jones's diagnosis of kyphosis, CT scan confirming the severity of her coccydynia, an abnormal EMG of her right shoulder . . . right calf atrophy . . . diminished grip strength, her HA, or her autoimmune disorder." (ECF No. 9 at 10-11.) In response, the Commissioner argues that substantial evidence supports the ALJ's physical RFC determination, and that the majority of the evidence Claimant seeks to rely upon is untimely. (ECF No. 12 at 11.). (ECF No. 12 at 9-15.)

As part of the RFC assessment, the ALJ must evaluate the claimant's "ability to perform work despite her limitations" in light of "'all' relevant record evidence." *Patterson*, 846 F.3d at 659 (citing 20 C.F.R. § 404.1520(e)). In doing so, "the ALJ [is] required to consider the combined, synergistic effect of all of Claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on Claimant." *Blankenship v. Astrue*, 3:11-cv-00005, 2012 WL 259952, at *12 (S.D.W. Va. Jan. 27, 2012) (citing *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989)). "The ailments should not be fractionalized and considered in

isolation; instead, their cumulative effect should be analyzed to determine the totality of their impact on the claimant's ability to engage in basic work activities." *Id.* (citing *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983)). "In the RFC assessment, the ALJ uses all relevant evidence, medical or otherwise, to determine a claimant's 'ability to meet the physical, mental, sensory, and other requirements of work.'" *Ladda v. Berryhill*, 749 F. App'x 166, 172 (4th Cir. 2018) (quoting 20 C.F.R. §§ 404.1545, 416.945). The ALJ's decision "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). "Thus, a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). Stated another way, "the ALJ must both identify evidence that supports his conclusion and 'build an accurate and logical bridge from [that] evidence to his conclusion.'" *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis deleted) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)).

As an initial matter, to the extent Claimant asserts that the ALJ was required to discuss the entirety of the evidence in the record as part of the RFC assessment, such a contention is plainly incorrect: "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2016) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam)); *Davenport v. Comm'r, Soc. Sec. Admin.*, 13-cv-739, 2013 WL 5883462, at *2 (D. Md. Oct. 29, 2013) ("[A]n ALJ is not required to address every piece of evidence in the record, so long as a reviewing court can determine from the opinion 'what the ALJ did and why he did it.'" (quoting *Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 762 n.10

(4th Cir. 1999))); *see Wallace v. Berryhill*, 1:17-cv-01218, 2017 WL 3782787, at *13 (S.D.W. Va. July 21, 2017) ("[T]hough the ALJ herein gave a thorough review of the available evidence of record, assuming *arguendo* that the ALJ failed to consider every piece of evidence, such is not the standard, because the issue before the Court is whether the ALJ's decision is supported by substantial evidence, not if she mentioned a particular piece of evidence."), *adopted by* 2017 WL 3763848 (S.D.W. Va. Aug. 30, 2017).  Rather, the "RFC assessment 'must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." *Ladda*, 749 F. App'x at 172 (quoting SSR 96-8p (July 2, 1996)).

In support of her argument that the ALJ's RFC determination is invalid, Claimant leans chiefly upon her various subjective complaints throughout the record in this case—including her complaints as reflected in her physicians' observations. As part of the RFC assessment, the ALJ is certainly required to evaluate a claimant's "statements and symptoms regarding the limitations caused by her impairments." *Linares v. Colvin*, 5:14-cv-00120, 2015 WL 4389533, at *5 (W.D.N.C. July 17, 2015) (citing 20 C.F.R. §§ 404.1529, 416.929; *Craig v. Chater*, 76 F.3d 585, 593–96 (4th Cir. 1996)).  However, Claimant's reporting of symptoms to her physician do not constitute self-substantiating clinical evidence. *See Craig v. Chater*, 76 F.3d 585, 590 n.2 (4th Cir. 1996) ("There is nothing objective about a doctor saying, without more, 'I observed my patient telling me she was in pain.'"). Rather, to evaluate the disabling effect of an individual's symptoms, including pain, the ALJ must first determine whether "objective medical evidence" supports the existence of "a condition reasonably likely to cause the [symptoms] claimed." *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006); *see* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). If so, the ALJ then "evaluate[s] the intensity and persistence of [the

claimant's] symptoms" to "determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). An individual's subjective complaints about his or her symptoms are relevant to the latter determination. *See id.* §§ 404.1529(c)(3), 416.929(c)(3). Put simply, the claimant's symptoms "must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the [symptoms], in the amount and degree, alleged by the claimant." *Johnson v. Barnhart*, 434 F.3d 650, 657 (4th Cir. 2005) (per curiam) (quoting *Craig*, 76 F.3d at 591). The ALJ is obligated to "assess whether the claimant's subjective symptom statements are consistent with the record as a whole." *Vass v. Berryhill*, 7:17-cv-87, 2018 WL 4737236, at *6 n.4 (W.D. Va. June 12, 2018), *adopted by* 2018 WL 4704058 (W.D. Va. Sept. 30, 2018).

In this case, the ALJ's RFC assessment included an appropriate narrative discussion describing how the evidence supports each conclusion, and he supported his reasoning with specific citations to the relevant medical facts and nonmedical evidence of record. Specifically, the ALJ began his RFC assessment by summarizing Claimant's allegations about her physical impairments and her hearing testimony, noting her statements regarding the sharp pain in the lower back and tailbone, as well as her complaints of back and shoulder pain and lack of grip strength. (Tr. 30.) The ALJ found that Claimant's medically-determinable impairments could reasonably be expected to cause the alleged symptoms, but determined that Claimant's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 31.) To that end, the ALJ summarized the evidence of record related to Claimant's conservative treatment for her back and shoulder problems and her COPD

and concluded that a limitation to less than the full range of medium work, with added limitations for the Claimant's right shoulder impairment, adequately accounted for her medically determinable impairments. (Tr. 32-33.) Specifically, with regard to Claimant's grip strength and claimed inability to lift more than eight pounds, the ALJ pointed to objective examination findings showing 5/5 grip strength in both hands. (Tr. 31.) With respect to Claimant's right shoulder, the ALJ noted that it has been treated conservatively with pain medication. (Tr. 32.) Likewise, Claimant's degenerative disc disease with sciatica was also treated conservatively with pain medication. (Tr. 32.) In addition to this conservative treatment, the ALJ supported his opinion with objective examination findings showing that Claimant had a "normal range of motion in both shoulders," showed "no atrophy, tenderness, redness, warmth, or swelling in the hands," showed "no paravertebral muscle spasm of the dorsolumbar spine," had a "normal straight leg raise test" and "normal muscle strength of 5/5 in the upper and lower extremities bilaterally; no atrophy; intact sensation; and normal deep tendon reflexes." (Tr. 32.)

The crux of the ALJ's analysis is that the record evidence demonstrated no ongoing difficulties or sustained effects on Claimant's everyday functioning that required additional RFC limitations. Put simply, the ALJ explained his reasons for concluding that Claimant's conditions were not as disabling as she claimed. "If the ALJ points to substantial evidence in support of his decision and adequately explains the reasons for his finding on the claimant's credibility, the court must uphold the ALJ's determination." *Brown v. Astrue*, 8:11-cv-03151-RBH-JDA, 2013 WL 625599, at *17 (D.S.C. Jan. 31, 2013), *adopted by* 2013 WL 625581 (Feb. 20, 2013). The ALJ further supported his RFC determination with the opinions of state agency physicians Dominic Gaziano, M.D., and Hedy Mountbatten-Windsor, M.D., who opined that Claimant can perform medium work

except can frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently balance, stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, and poor ventilation.[2] (Tr. 31.) The undersigned **FINDS** the ALJ's decision is supported by substantial evidence.

The undersigned agrees with the Commissioner that Claimant's argument relies on medical records that either significantly predate the relevant time period or were otherwise appropriately excluded as untimely. First, the Claimant's reliance on Dr. Morgan's opinion is misplaced, because it was appropriately excluded by the ALJ. Generally, an ALJ "may decline to consider" supplemental evidence when a claimant fails to raise the issue at least five (5) business days before the scheduled date of the claimant's hearing. 20 C.F.R. § 404.935(a). Here, Claimant submitted Dr. Morgan's opinion only four days prior to her hearing before the ALJ. (Tr. 45, 75.) Without any argument from Claimant that an exception applies, Dr. Morgan's opinion was plainly submitted out of time. Accordingly, the ALJ permissibly determined it was not admitted as part of the record. (Tr. 23-24.) Additionally, most of the remaining medical evidence Claimant relied upon predates Claimant's alleged onset date by several years, and instead coincides with the time period prior to 2018 in which Claimant was still working. (Tr. 410.)

Claimant also argues that remand is appropriate because the ALJ found that Claimant had mild limitations in the four areas of mental functioning, *see* 20 C.F.R. § 404.1520a(c)(4), but did not include any mental functional limitations in his RFC finding

---

[2] The ALJ is entitled to rely on the state-agency medical consultants' opinions if she explains her reasons for doing so and if the opinions are consistent with the record evidence. *See Brumfield v. Colvin*, 3:14-10719, 2015 WL 1482285, at *8 (S.D.W. Va. Mar. 31, 2015); *see also Lester v. Berryhill*, 2:17-cv-04376, 2018 WL 4956532, at *25 (S.D.W. Va. Sept. 21, 2018), *adopted by* 2018 WL 4956122 (Oct. 12, 2018). Importantly, Claimant does not take issue with the weight the ALJ accorded to those opinions. (*See* ECF No. 9.)

and dispositive hypothetical question. (ECF No. 9 at 17.) The Commissioner argues in response that substantial evidence supports the ALJ's RFC determination. (ECF No. 12 at 13.) The ALJ's narrative makes clear that he concluded the Claimant did not have work-related limitations as a result of her mental impairments. *See Mosley v. Berryhill*, 2:17-cv-04197, 2018 WL 4781297, at *9 (S.D. W. Va. Sept. 5, 2018), *report and recommendation adopted*, 2018 WL 4781183 (Oct. 3, 2018) ("When, as here, an ALJ determines that mental impairments create only a mild limitation, the ALJ is perfectly justified in concluding that no related functional limitation belongs in the RFC finding."). In conducting his RFC assessment, the ALJ relied on the opinion of state agency psychologist Paula Bickham, Ph.D., who opined that Claimant's mental impairments are non-severe. (Tr. 28.) He explained that he found Dr. Bickham's opinion persuasive because it is consistent with relevant treatment records showing that Claimant has only attended a few counseling sessions in February 2021 and March 2021, has not received emergency room or inpatient treatment for her mental impairments, and, while Claimant was noted to have an anxious mood, she also objectively demonstrated appropriate affect and a cooperative attitude. (Tr. 28.) The ALJ explained that—although state agency psychologist Debra Lilly, Ph.D., opined that Claimant's residual functional capacity limits her to performing one to three step tasks in settings in which she does not have high production quotas and a work-like setting that does not require frequent interactions with the general public—Dr. Lilly's assessment was not persuasive. (Tr. 28.) Specifically, the ALJ found that Dr. Lilly's assessment was inconsistent with treatment records showing that "the claimant's primary care provider has managed her major depressive disorder, [PTSD], generalized anxiety disorder, and panic disorder with psychotropic medication." (Tr. 28.) Thus, the ALJ's narrative discussion appropriately identified substantial

evidence that supported his conclusion, and built an accurate and logical bridge between his conclusion and the evidence. *Monroe*, 826 F.3d at 189. That Claimant would have preferred the ALJ come to a different conclusion is of no moment; because the ALJ's RFC determination is supported by substantial evidence, remand is improper.

Claimant also argues that remand is proper because the ALJ did not conduct a function-by-function analysis of *all* of Claimant's impairments—both severe and non-severe—in formulating his conclusion that Claimant had the RFC to perform a limited range of medium work. The regulations instruct that the ALJ's RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. Social Security Ruling 96-8p, 61 Fed. Reg. 34, 474 (July 2, 1996). Those functions "include physical abilities such as sitting, standing, walking, lifting, carrying, pushing, and pulling; mental abilities such as understanding, remembering, carrying out instructions, and responding appropriately to supervision; and other abilities such as seeing, hearing, and the ability to tolerate environmental factors." *Ashby v. Colvin*, 2:14-cv-674, 2015 WL 1481625, at *2-3 (S.D. W. Va. Mar. 31, 2015). It is only after that function-by-function analysis has been completed that the RFC may be expressed in terms of the exertional levels of work (sedentary, light, medium, heavy, and very heavy). *Id.*

Here, the ALJ did perform a function-by-function analysis of Claimant's impairments during the relevant time period. (Tr. 26-28.) First, the ALJ explained that not all of the Claimant's impairments were medically determinable. (Tr. 25-27.) He explained, for instance, that Claimant's testimony regarding experiencing diarrhea problems was not supported by her medical records, which showed that Claimant "received minimal treatment for diarrhea since the alleged onset date." (Tr. 25.) The ALJ

then analyzed Claimant's medically determinable impairments using specific citations to relevant evidence, and explained the logic of his conclusions. (Tr. 25-32.)

Moreover, even if the ALJ had not performed a function-by-function analysis, the Fourth Circuit clarified that an ALJ's failure to do so does not constitute a *per se* basis for remand. *Ashby*, 2015 WL 1481625, at *3 (citing *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015)). The Fourth Circuit went on to explain that remand "would prove futile" in cases where the ALJ does not discuss functions that are irrelevant or uncontested. *Id.* Instead, "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* In *Mascio*, for example, remand was proper because the ALJ did not explain how the ALJ arrived at his conclusions; for instance, he "concluded that Mascio could lift only 20 pounds without explaining his rationale for rejecting a conflicting finding that Mascio could lift 50 pounds." *Id.* Unlike the ALJ in *Mascio*, here the ALJ explained, for example, his rationale for relying on Dr. Bickham's opinion for Claimant's mental RFC and rejecting Dr. Lilly's conflicting opinion. (Tr. 28.) Because the ALJ provided a logical bridge between the evidence and his conclusions, his decision does not create the problem identified by the Fourth Circuit in *Mascio* where inadequacies in his analysis frustrate meaningful review.

Furthermore, even if the ALJ's RFC determination had been flawed, Claimant has nonetheless failed to demonstrate more than harmless error on the ALJ's part. *See Shinseki v.* Sanders, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination"). While the ALJ determined Claimant could return to her previous employment—which constituted semi-skilled work—Claimant omits that the ALJ found Claimant could return to her food-

service job as that job is *actually performed*, which was in an unskilled manner. (Tr. 32, 70-71.) Additionally, the ALJ—supported by the VE's testimony—found in the alternative that Claimant could perform at least two representative unskilled medium jobs.

Lastly, the Claimant—noting the ALJ's emphasis on the conservative treatment Claimant sought for her mental impairments—contends that she did not seek treatment because she was "indigent" and had mental limitations. (ECF No. 9 at 6.) Social Security Ruling 96-7p provides that an ALJ must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek treatment. Not only did Claimant fail to raise this issue below, but MA Steinhoff noted during Claimant's consultative mental status examination that she reported having assets that were "too high" to qualify for Medicaid. (Tr. 439.) Similarly, Dr. Morgan noted that Claimant reported she stopped seeing her therapist because she wanted to find someone else, not that her economic or mental condition prevented her from accessing treatment. (Tr. 471.) Furthermore, the ALJ did not deny Claimant benefits based on a lack of medical treatment; rather, "[t]he ALJ simply found that during the relevant period of time . . . Claimant's treatment was conservative in nature, consisting of medications, injections, and some therapy." *Smith v. Astrue*, 5:07-cv-794, 2009 WL 899419, at *6 (S.D. W. Va. Mar. 31, 2009).

Put simply, the ALJ's discussion considered the evidence, made reasonable and supportable choices, and clearly articulated his reasoning. For the reasons stated herein, the undersigned therefore **FINDS** that the decision finding Claimant was not disabled is supported by substantial evidence; accordingly, remand is improper.

### C. Constitutionality

Finally, Claimant argues that "the ALJ and Appeals Council members were not properly appointed" under the constitution "by an official with any valid legal authority to do so" and therefore "[t]his case must be remanded to a new properly appointed ALJ for a *de novo* hearing and decision. (ECF No. 9 at 19-20.) In support of her argument, the Plaintiff refers this Court to the exact same arguments purported by the claimants in *Brian T.D. v. Kijakazi*, 2022 WL 179540 (D. Minn. Jan. 20, 2022), *appeal filed*, 22-1601 (8th Cir. Mar. 22, 2022) and *Richard J.M. v. Kijakazi*, 2022 WL 959914 (D. Minn. Mar. 30, 2022), appeal filed, No. 22-2127 (8th Cir. May 27, 2022) and asks this Court to adopt the findings and conclusions made therein. Specifically, Claimant asserts that former Acting Commissioner Nancy Berryhill's term as Acting Commissioner ended on November 16, 2017 under the Federal Vacancies Reform Act ("FVRA"); however, Ms. Berryhill served as Acting Commissioner of the Social Security Administration until Andrew Saul became commissioner on June 17, 2019. *Id.* at 19. According to the Claimant, "Ms. Berryhill continuing as the head of SSA after November 16, 2017 violated both the FVRA and the Constitution's Appointments Clause" and should result in a finding that Ms. Berryhill's actions after that date had no legal validity. *Id.* In response, the Commissioner argues that "[e]ven if Ms. Berryhill was not validly serving as Acting Commissioner when she ratified the appointments of SSA ALJs, [Claimant] is not automatically entitled to a new hearing." (ECF No. 12 at 28.)

As an initial matter, the Court takes judicial notice as follows: that Nancy Berryhill was designated Acting Commissioner on January 21, 2017, and served until November 16, 2017, when the initial 210-day period for acting service expired; that on April 17, 2018, President Trump nominated Andrew Saul to be the Commissioner of SSA; that upon

submission of the nomination, Ms. Berryhill resumed her service as Acting Commissioner during the nomination's pendency pursuant to 5 U.S.C. § 3346(a)(2), and served until Mr. Saul was sworn in as Commissioner; and that on July 16, 2018, Acting Commissioner Berryhill ratified the appointments of all SSA ALJs and approved them as her own.

Claimant urges the Court to rely on the approach taken by the U.S. District Court for the District of Minnesota (the "Minnesota District Court") in the *Brian T.D.* and *Richard J.M.* matters, in which that court concluded that because the initial 210-day acting service period lapsed before the submission of Mr. Saul's nomination in April 2018, Ms. Berryhill could not serve as Acting Commissioner during the pendency of Mr. Saul's nomination and thus could not lawfully ratify and approve the appointments of SSA ALJs as her own. After having reviewed this issue at considerable length, however, the undersigned finds that the Minnesota District Court's approach is an outlier; numerous other courts within and without the Fourth Circuit have rejected the holdings in the cases endorsed by the Plaintiff, and/or have otherwise rejected the constitutional challenges to an ALJ's appointment based on similar arguments.[3]

The FVRA provides the statutory authority for "temporarily authorizing an acting official to perform the functions and duties of a vacant executive branch position

---

[3] *See, e.g., M.A.K. v. Kijakazi*, 2022 WL 16855690, at *4 (D. Colo. Nov. 10, 2022); *Mark F. v. Berryhill*, 2019 WL 1055098, at n.2 (S.D. Ind. Mar. 6, 2019); *Sidney M. v. Kijakazi*, 2022 WL 4482859, at *15-21 (N.D. Iowa Sept. 26, 2022); *Lopez Davila v. Berryhill*, 2018 WL 6704772, at *1 n.1 (D. Mass. Nov. 6, 2018); *Mia S. v. Kijakazi*, 2022 WL 3577023, at *13-14 (D. Neb. Aug. 19, 2022); *Avalon v. Kijakazi*, 2022 WL 1746976, at *8 (D. Nev. May 27, 2022); *Taylor v. Kijakazi*, 2022 WL 4668273, at *9-12 (M.D.N.C. Aug. 2, 2022), *report and recommendation adopted*, 2022 WL 4621418 (Sept. 30, 2022); *Williams v. Kijakazi*, 2022 WL 2163008, at *3 (W.D.N.C. June 15, 2022); *Patterson v. Berryhill*, 2018 WL 8367459, at *1 (W.D. Pa. June 14, 2018); *Lance M. v. Kijakazi*, 2022 WL 3009122, at *10-14 (E.D. Va. July 13, 2022), *report and recommendation adopted*, 2022 WL 3007588 (E.D. Va. July 28, 2022); *Taylor v. Saul*, 2019 WL 3837975, at *4 (W.D. Va. Aug. 15, 2019); *Thomas S. v. Commissioner*, 2022 WL 268844, at *3 n.2 (W.D. Wash. Jan. 28, 2022).

requiring Presidential appointment and Senate confirmation. 5 U.S.C. § 3347. Individuals who may serve as an acting official are subject to time limitations prescribed by statute. *See* 5 U.S.C. § 3346. The FVRA provides for acting service during *either or both* of two periods: (1) a period of 210 days after the vacancy; or (2) during the pendency of a first or second nomination. *See*  5 U.S.C. § 3346(a) (providing that an acting official who is serving under the FVRA may serve "for no longer than 210 days from the date of the vacancy, "or," once "a first or second nomination for the office is submitted to the Senate . . . for the period that the nomination is pending in the Senate"). Importantly, the text of the statute does not contain any requirement that a nomination be submitted within the initial 210-day period; rather, the statute simply provides that "*once* a first or second nomination . . . is submitted," the acting official designated under the FVRA may serve "for the period that the nomination is pending." 5 U.S.C. § 3346(a)(2) (emphasis added). Thus, "once" Mr. Saul's "nomination for the office" of Commissioner "[wa]s submitted to the Senate," Ms. Berryhill could serve "for the period that the nomination [wa]s pending in the Senate." *Id.* § 3346(a).

The majority of courts addressing this issue have agreed § 3346(a)(2) "contains a 'spring-back' provision that enabled Ms. Berryhill to resume her role as Acting Commissioner as of the date that Andrew Saul was nominated for Commissioner in April 2018. *See, e.g., Brooks v. Kijakazi*, 2022 WL 2834345, at *23 (M.D.N.C. July 20, 2022) ("[T]he plain language of Section 3346(a) of the FVRA makes clear that Section 3346(a)(2) provided authority for Berryhill to resume service as Acting Commissioner as of the date of President Trump's nomination of Saul for Commissioner on April 17, 2018"); *Thomas S. v. Comm'r*, 21-cv-05213, 2022 WL 268844, at *3 n.2 (W.D. Wash. Jan. 28, 2022); *Reuter v. Saul*, 19-cv-2053, 2020 WL 7222109, at *15 n.11 (N.D. Iowa May 29,

34

2020), *adopted by* 2020 WL 6161405, at *6 (Oct. 21, 2020); *Nw. Immigrant Rts. Proj. v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 57-58 (D.D.C. 2020) (finding that, although "far more than 210 days passed" after resignation of permanent official before submission of nomination, a "separate provision of the FVRA permits an acting official to serve 'from the date of a first nomination for the vacant office and 'for the period that the nomination is pending in the Senate,' " such that acting official could "lawfully serv[e] as Acting Secretary" upon submission of nomination).

Moreover, to the extent Claimant has alleged that the ALJ's decision in this case was constitutionally invalid, she nevertheless fails to show how the alleged illegality actually impacted her claims. See, e.g., *Taylor v. Kijakazi*, 2022 WL 4668273, at *8 (plaintiff failed to show how or why Section 902(a)(3), while unconstitutional, harmed her). Accordingly, the undersigned having found no error in the Commissioner's decision, respectfully recommends that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 9), and **GRANT** the Commissioner's request to affirm her decision (ECF No. 12).

## *IV.    CONCLUSION*

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 9), **GRANT** the Commissioner's request to affirm her decision (ECF No. 12), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and

Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Enter:        January 30, 2023

Dwane L. Tinsley
United States Magistrate Judge